**In re Mozelle E. JOHNSON, Appellant,**

v.

**ASSET MANAGEMENT GROUP, LLC, Appellee.**

**No. CIV. A. MJG–98–2049.**

United States District Court, D. Maryland, Northern Division.

Sept. 30, 1998.

Joseph V. Delclos, Baltimore, MD, for Appellant.

William M. Savage, Shapiro & Burson, Faixfax, VA, for Appellee.

GARBIS, District Judge.

The Court has before it Appellant Mozelle E. Johnson's appeal from the United States Bankruptcy Court for the District of Maryland's Order dismissing the Debtor's Objection to the Amended Proof of Claim and the materials submitted by the parties relating thereto. The Court finds that a hearing is unnecessary.

## I. BACKGROUND

In June of 1995, Mozelle E. Johnson obtained a $55,000 home loan. The lender secured the loan with a first deed of trust on

Ms. Johnson's home and primary residence. Six months later Ms. Johnson obtained a home improvement loan from Homefix Corporation for $8000. Homefix Corporation, in turn, received a second deed of trust encumbering Ms. Johnson's residence.

By August 1997, Ms. Johnson had defaulted on the first mortgage. On August 12, 1997, ContiMortgage, now in possession of the first mortgage, sent Ms. Johnson a Notice of Default and Acceleration and informed her that she now owed over $57,000. In September 1997, a housing counselor appraised the Johnson home at $48,000. Ms. Johnson then sought protection under the bankruptcy laws and filed under Chapter 13 on October 1, 1997.

Within two weeks, Asset Management Group, LLC ("Asset Management"), now the holder of the home improvement lien, filed a Proof of Claim, asserting a secured claim against the bankruptcy estate. As amended, Asset Management's claim totaled $10,226.57. Ms. Johnson filed an Objection to the Proof of Claim.

The parties agree to the relevant facts. Ms. Johnson does not dispute the amount of her debt to Asset Management. Also the parties have stipulated that the value of Ms. Johnson's residence is less than the balance owed on the first deed of trust.

■ The only dispute involves the legal consequence that flows from the agreed facts.[1] According to the United States Bankruptcy Code,[2] 11 U.S.C. § 506(a), Asset Management's lien would be considered completely unsecured. Yet, Asset Management asserts that because they hold a "claim secured only by a security interest on the debtor's principal residence" under § 1322(b)(2), their rights and the lien are not subject to modification. Ms. Johnson asserts

that § 1322(b)(2) protects only the rights of a claim holder whose claim is at least partially secured. Thus, Ms. Johnson argues, the Asset Management lien could be modified or even "stripped off."[3]

On May 11, 1998, the Bankruptcy Court held a hearing on the Claim and Objection. The Bankruptcy Judge ruled that § 1322(b)(2) protects junior homestead liens such as Asset Management's, even when the value of the collateral is more than consumed by a senior lien. Thus, the Court dismissed Ms. Johnson's Objection and allowed Asset Management's Claim as filed. Ms. Johnson appealed the Bankruptcy Court's Order to this Court.

## II. LEGAL STANDARD

■ When a District Court reviews a Bankruptcy Court final order, the District Court acts as an appellate court. Accordingly, legal conclusions are reviewed *de novo*, whereas findings of fact may be set aside only if "clearly erroneous." *See In re Bulldog Trucking, Inc.*, 147 F.3d 347, 351 (4th Cir.1998); *Rinn v. First Union Nat'l Bank of Md.*, 176 B.R. 401, 407 (D.Md.1995); Fed. R. Bankr.P. 8013.

## III. DISCUSSION

■ The issue presented by this case is whether a debtor's Chapter 13 bankruptcy payment plan may strip off the lien of a creditor holding a junior lien that is both: (1) wholly "unsecured" in terms of § 506(a); and (2) "secured only by a security interest in real property that is the debtor's principal residence," § 1322(b)(2). For the reasons stated herein, this Court concludes that a strip off is permissible.

A Chapter 13 bankruptcy requires a debtor to formulate a payment plan. This plan

---

1. In their brief, Asset Management asserts that, procedurally, a strip off cannot occur by way of an Objection to a claim and that an adversary proceeding must occur. However, because the procedural issue was not raised below, Asset Management acknowledges that it cannot be presented on appeal.

2. All statutory references herein are to the Bankruptcy Code, 11 U.S.C., unless otherwise indicated.

3. In a "strip off" the entire lien is removed, whereas in a "strip down" a lien is bifurcated into secured and unsecured claims with only the unsecured claim component being removed. *See In re Lam*, 211 B.R. 36, 37 n. 2 (9th Cir. BAP 1997).

must comply with the guidelines set forth in § 1322(b). The statute provides:

Subject to subsections (a) and (c) of this section, the plan may -

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

§ 1322(b).

Section 506(a) determines whether a claim that is "secured" under commercial law is, or is not, a "secured claim" in the context of the Bankruptcy Code. Section 506(a) states:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

The issue of the interplay between §§ 506(a) and 1322(b)(2) in the context of completely unsecured junior homestead liens is one of first impression for this Court. Moreover, the issue also has not been directly addressed in any published opinion of the United States Court of Appeals for the Fourth Circuit. The issue has, however, been much debated in bankruptcy court and three district court opinions. The courts have divided on the issue, with the majority deciding that such liens may be stripped off. *See, e.g., In re Lam,* 211 B.R. 36 (9th Cir. BAP 1997) (allowing strip off); *In re Purdue,* 187 B.R. 188 (S.D.Ohio 1995) (same); *Wright v. Commercial Credit Corp.,* 178 B.R. 703 (E.D.Va.1995); *In re Cerminaro,* 220 B.R. 518 (Bankr.N.D.N.Y.1998); *In re Cervelli,* 213 B.R. 900 (Bankr.D.N.J.1997); *In re Scheuer,* 213 B.R. 415 (Bankr.N.D.N.Y.1997); *In re Bivvins,* 216 B.R. 622 (Bankr. E.D.Tenn.1997); *In re Geyer,* 203 B.R. 726 (Bankr.S.D.Cal.1996); *In re Sanders,* 202 B.R. 986 (Bankr.D.Neb.1996); *In re Sette,* 164 B.R. 453 (Bankr.E.D.N.Y.1994); *In re Hornes,* 160 B.R. 709 (Bankr.D.Conn.1993). *But see, e.g., In re Tanner,* 223 B.R. 379 (Bankr.M.D.Fla.1998) (denying strip off); *In re Lewandowski,* 219 B.R. 99 (Bankr.W.D.Pa. 1998) (same); *In re Bauler,* 215 B.R. 628 (Bankr.D.N.M.1997); *In re Fraize,* 208 B.R. 311 (Bankr.D.N.H.1997); *In re Neverla,* 194 B.R. 547 (Bankr.W.D.N.Y.1996); *In re Jones,* 201 B.R. 371 (Bankr.D.N.J.1996).

The split in decisions arises from different interpretations of *Nobelman v. American Savings Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) (superseded in part by statute). In *Nobelman,* the debtor's home, worth $23,500, was encumbered with a single homestead lien of $71,335. *Id.* at 326, 113 S.Ct. at 2108. The debtor proposed to bifurcate the lien into a secured claim of $23,500, and an unsecured claim of $47,835. *Id.* The debtor argued that § 1322(b)(2) protected only that part of the claim defined as secured under § 506(a). The debtor further asserted that the unsecured claim component could be stripped down. *Id.* at 328, 113 S.Ct. at 2109. The creditor argued that bifurcation would modify its rights in violation of § 1322(b)(2). *Id.* The Court held that " § 1322(b)(2) prohibits a Chapter 13 debtor from relying on § 506(a) to reduce an undersecured homestead mortgage to the fair market value of the mortgaged residence." *Id.* at 325–26, 113 S.Ct. at 2108.

First, the *Nobelman* Court held that when a creditor's lien is at least partially secured, § 506(a) does not operate to eliminate the creditor's rights in the unsecured claim component. *Id.* at 328–29, 113 S.Ct. at 2109–10. The debtors had asserted that a bifurcation and strip down did not modify a creditor's rights because, in effect, the creditor had no rights in the unsecured claim component. However, the Court stated:

This interpretation fails to take adequate account of § 1322(b)(2)'s focus on "rights." That provision does not state that a plan may not modify "a claim secured only by" a home mortgage. Rather, it focuses on the modification of the "rights of holders" of such claims.... Petitioners were correct in looking to § 506(a) for a judicial valuation of the collateral to determine the status of the bank's secured claim.... But even if we accept petitioners' valuation, the bank is still the "holder" of a "secured claim," because petitioners' home retains

$23,500 of value as collateral.... [H]owever, that determination does not necessarily mean that the "rights" the bank enjoys as a mortgagee, which are protected by § 1322(b)(2), are limited by the valuation of its secured claim.

*Id.* at 328, 113 S.Ct. at 2109–10. The Court continued by noting that "rights" are not defined in the Bankruptcy Code, but rather are governed by the mortgage agreement and are given substance by state property law.

Second, the *Nobelman* Court rejected the debtor's assertion that the anti-modification provision in § 1322(b)(2) applied only to secured claim components. The Court held that "a claim secured only by a" homestead lien refers "to the lienholder's entire claim, including both the secured and the unsecured components of the claim." *Id.* at 331, 113 S.Ct. at 2111. The Court reasoned that a bifurcation could not be allowed because a debtor could not "modify the payment and interest terms for the unsecured component, ... without also modifying the terms of the secured component." *Id.*

Those courts that prohibit a strip off of completely unsecured junior homestead liens, that is, those expressing the minority view, focus on the Supreme Court's "rights" analysis and what they find to be the "plain language" of § 1322(b)(2). These courts find that the mortgage contract alone creates "rights" which may not be modified regardless of whether a claim is secured or unsecured. *See In re Tanner,* 223 B.R. at 382 (finding the "plain meaning" of § 1322(b)(2) and *Nobelman's* "expansive definition of rights" preclude strip off, stating that the creation of rights does not depend on the existence of equity); *In re Bauler,* 215 B.R. 628, 632 (explaining that the "plain language" of § 1322(b)(2) supports prohibiting strip offs); *In re Fraize,* 208 B.R. 311, 313 (same); *In re Neverla,* 194 B.R. 547, 550 (finding a literal reading of § 1322(b)(2) protects "all properly perfected holders of Homestead Mortgages"); *In re Jones,* 201 B.R. 371 (prohibiting strip off because of plain language of § 1322(b)(2) and because of *Nobelman's* focus on creditors' rights, finding the existence

of a mortgage lien alone gives a creditor rights § 1322(b)(2) protects).

Certainly a mortgage contract does create rights for the creditors. *See Nobelman,* 508 U.S. at 329, 113 S.Ct. at 2110 ("The bank's 'rights,' therefore, are reflected in the relevant mortgage instruments ..."). Yet, the application of § 1322(b)(2)'s anti-modification clause determines the proper scope of the protection of those rights. *Id.* at 329, 113 S.Ct. at 2110 (noting state property rights control "[i]n the absence of a controlling federal rule"); *In re Hornes,* 160 B.R. at 715 (citing *Nobelman* and finding that § 1322(b)(2) overrides the state rights of a wholly unsecured junior homestead lienholder). In *Nobelman,* the Court was faced with determining the rights of a creditor who had a claim that was at least partially secured. *Id.* The Court did not address the rights of a totally unsecured homestead lienholder or whether § 1322(b)(2) also protected those rights. *See, e.g., In re Lam,* 211 B.R. at 40 (distinguishing *Nobelman* because of the difference between a partially secured claim and a wholly unsecured claim); *Wright,* 178 B.R. at 706 (collecting cases that rely on the distinction); *In re Cerminaro,* 220 B.R. at 524 (noting that *Nobelman* did not address a wholly unsecured junior lien); *In re Scheuer,* 213 B.R. at 418 (same); *In re Geyer,* 203 B.R. at 729 (same); *In re Sanders,* 202 B.R. at 988 (same); *In re Hornes,* 160 B.R. at 715 (same); 8 Collier on Bankruptcy, § 1322.06[1][a] at 1322–21 (L. King 15th Ed.1997) (stating that the *Nobelman* opinion "strongly suggests ... that if a lien is completely undersecured, there would be a different result").

The courts in the minority too easily dismiss the role of a § 506(a) valuation. *See, e.g., In re Lam,* 211 B.R. at 40 (citing cases that rely on *Nobelman's* reference to § 506(a)); *In re Cerminaro,* 220 B.R. at 524 (noting the Supreme Court's reference to § 506(a) valuation); *In re Cervelli,* 213 B.R. at 908 (same); *In re Scheuer,* 213 B.R. at 418 (same); *In re Hornes,* 160 B.R. at 713 (same). The *Nobelman* Court stated that, "By virtue of its mortgage contract with petitioners, the bank is indisputably the holder of a claim secured by a lien on petitioners'

home." 508 U.S. at 328, 113 S.Ct. at 2110. In the very next sentence, the Supreme Court found that it was correct for a Chapter 13 debtor, in the context of a homestead lien, to seek a § 506(a) valuation. *Id.* Further, the Court stated that in this context, the valuation should be used to "determine the status of the [creditor's] secured claim." *Id.* These statements refute the analysis of courts that find a valuation to be irrelevant. In a § 1322(b)(2) plan, a valuation cannot be both irrelevant and necessary to determine the status of a homestead lien. *See In re Hornes,* 160 B.R. at 713 (finding it "significant that the Court did not adopt the conclusion of the Fifth Circuit that § 506(a) and § 1322(b)(2) were in conflict" but rather gave effect to each statute). Therefore, the Supreme Court's acceptance of a § 506(a) valuation in the context of § 1322(b)(2) must control.

The courts in the minority cite the Supreme Court's rejection of the "rule of the last antecedent" as supporting their refusal to strip off wholly unsecured junior homestead liens. *See In re Neverla,* 194 B.R. at 550 (noting Supreme Court's rejection of rule); *In re Jones,* 201 B.R. at 373–74 (citing rejection of rule in disagreeing with debtor that claim must be partially secured). In *Nobelman* the debtor argued that according to that rule of interpretation, the word "claim" in the anti-modification clause referred back to the preceding clause which addressed only "secured claims." 508 U.S. at 330, 113 S.Ct. at 2111. Therefore, according to the debtor, the word "claim," in § 1322(b)(2)'s anti-modification phrase, meant a claim that was secured according to § 506(a), including § 506(a)'s bifurcation. The Supreme Court rejected that interpretation. *Id.* at 330–31, 113 S.Ct. at 2111. The minority courts interpret that rejection to mean that any claim, secured or wholly unsecured, merits protection under the anti-modification clause.

The argument that if "claim" does not mean "secured claim," then it must mean *any* claim fails to put the *Nobelman* decision in context. *See In re Cerminaro,* 220 B.R. at 524 (finding that even though Supreme Court rejected the "rule of the last antecedent" the

Court did not thereby "implicitly dismiss[ ] the necessity" of § 506(a) analysis); *In re Hornes,* 160 B.R. at 714 (same). The Court itself stated that it was addressing the "interplay between" §§ 1322(b)(2) and 506(a). *Nobelman,* 508 U.S. at 325, 113 S.Ct. at 2108.

Section 506 is a statute that applies to bankruptcy proceedings under Chapters 7, 11, 12, and 13. 11 U.S.C. § 103(a). "Bifurcation is generally permitted under" § 506(a). *In re Witt,* 113 F.3d 508, 510 (4th Cir.1997). In contrast, § 1322(b)(2) protects only certain claim holders in Chapter 13 proceedings. The Supreme Court found that it would be "impossible" to reduce a claim to fair market value, to bifurcate under § 506(a), without modifying a creditor's rights in violation of § 1322(b)(2). *Nobelman,* 508 U.S. at 331, 113 S.Ct. at 2111. For this reason the Court found that the "more reasonable" interpretation of "claim" in the instant context is "entire claim." *Id.* The Court's holding that "claim" means "entire claim" is not the same as holding that "claim" means "any claim" or "unsecured claim." The Court approved using § 506(a) valuation procedures to determine the status of a claim, but found that § 1322(b)(2) modified § 506(a) by prohibiting bifurcation of homestead liens.

The courts prohibiting strip offs argue that it is unreasonable to rely overly much on valuations. Because valuations are unscientific, these courts find it irrational that lienholders' rights could turn on the difference of a single dollar in valuation. *See In re Tanner,* 223 B.R. at 383 (holding that valuations are "arbitrary and unscientific" and so should not be emphasized); *In re Bauler,* 215 B.R. at 632 (explaining that the policy consideration of avoiding too much emphasis on valuations supports prohibiting strip offs); *In re Fraize,* 208 B.R. at 313 (same); *In re Neverla,* 194 B.R. at 550 (same, and also explaining that allowing valuations to affect creditors rights could result in "potential pre-bankruptcy planning abuse"); *In re Jones,* 201 B.R. 371 (prohibiting strip off because of fear of placing too much emphasis on valuations). For example, a home may be subject to two liens, one for $50,000 and another for $20,-000. If the home is valued at $50,001, then

the junior lien would be protected under *Nobelman* and could not be stripped off. Yet, if the home is valued for just one dollar less, then the junior lien would be completely unsecured and subject to strip off.

However, as stated above, § 506(a) valuations occur in bankruptcy proceedings under Chapters 7, 11, 12, and 13. § 103(a). In each of those cases where more than one lien exists the junior lien risks being "unsecured." The fact that courts may be concerned with drawing sharp lines with harsh effects does not excuse the need for doing so. *See, e.g., In re Kerwin,* 996 F.2d 552, 560 (2d Cir.1993) ("Determining the market value of real property is a constant feature in today's commercial world. Such valuations are regularly used by prudent lenders . . ."); *In re Lam,* 211 B.R. at 41 (finding concern over valuations "unfounded"); *In re Cervelli,* 213 B.R. at 908 (citing *Lam*); *In re Scheuer,* 213 B.R. at 419 (stating it is not for courts to amend the Code); *In re Bivvins,* 216 B.R. at 625 (noting that the law often uses such cut offs); *In re Hornes,* 160 B.R. at 716 (quoting *In re Kerwin*). The Code provides that valuations must be performed and they must be given effect.

Additionally, a junior lienholder has no "right" to be treated more favorably in bankruptcy than in foreclosure. *In re Tanner,* 223 B.R. at 383 (denying strip off but acknowledging that the result is that "a creditor will have greater rights in bankruptcy than those bargained for under state law"). In the instant case, for example, the debtor had defaulted on the senior lien before declaring bankruptcy and was thus at risk of foreclosure. A completely unsecured junior lienholder would receive nothing in a foreclosure proceeding because all proceeds would go to the senior lien holder. *See, e.g., In re Lam,* 211 B.R. 36 (noting "a forced sale [by unsecured creditor] would not result in any financial return to the lienholder"); *In re Woodhouse,* 172 B.R. 1, 2 (Bankr.D.R.I.1994) (finding the rights of an unsecured lienholder to be "illusory, hyper-technical, and possibly relevant only in law review articles"); *In re Hornes,* 160 B.R. 709. Further, in foreclosure the wholly unsecured junior lien would be extinguished. *In re Tanner,* 223 B.R. at

383. Yet, if the junior lien is not stripped off in bankruptcy, the lienholder retains a security interest in the debtor's home, the right to payment under the plan, and the right to object to the payment plan. *See In re Neverla,* 194 B.R. at 553 (stating, after denying strip off, that creditors will be paid in full); 11 U.S.C. § 1325 (providing criteria for the confirmation of a payment plan, and that a secured creditor must accept the plan and retain the lien and that an unsecured creditor may object to confirmation of the plan).

Asset Management holds a completely unsecured junior homestead lien. In the view of this Court, the Supreme Court's *Nobelman* decision does not prohibit the stripping off of such a lien. Code sections 1322(b)(2) and 506(a) provide that such a lien may be stripped off and the rights of the unsecured creditor modified.

### IV. CONCLUSION

For the foregoing reasons:

1. The June 8, 1998 Order dismissing Ms. Johnson's Objection to the Amended Proof of Claim and allowing Asset Management Group's Proof of Claim as filed shall be REVERSED.

2. This case shall be REMANDED to the Bankruptcy Court for further proceedings consistent herewith.