In re Billings MANN and Cheryl
Mann, Debtors.

Domestic Bank, Successor to Domestic
Loan and Investment Bank,
Appellant,

v.

Billings Mann and Cheryl
Mann, Appellees.

No. RI 99–059.

United States Bankruptcy Appellate Panel
of the First Circuit.

June 30, 2000.

Lisa A. Geremia and Geremia & DeMarco, Ltd., Providence, RI, on brief for Appellant.

Christopher M. Lefebvre, Pawtucket, RI, on brief for the Appellees.

Matthew J. McGowan, Providence, RI, on brief for BankBoston, N.A., amicus curiae.

John Rao, Providence, RI, on brief for the National Association of Consumer Bankruptcy Attorneys, amicus curiae.

Before QUEENAN, HAINES and BOROFF, U.S. Bankruptcy Judges.

BOROFF, Bankruptcy Judge.

 Billings and Cheryl Mann (the "Debtors"), debtors in a bankruptcy case pending in the United States Bankruptcy Court for the District of Rhode Island, have two mortgage liens on their principal residence. The value of the residence is insufficient to cover the balance on the first mortgage. The Debtors' Chapter 13 plan treats the second mortgage as wholly unsecured and then voids or strips off[1] that lien. The bankruptcy court confirmed the Debtors' plan over the objection of Domestic Bank (the "Bank"), the second mortgagee. The Bank appeals, asking us to opine that the antimodification clause of § 1322(b)(2) precludes the voiding of a junior mortgage lien on a debtor's principal residence. Upon review of the bankruptcy court's determination, we affirm.

## I. FACTS

The facts in this case are not in dispute and are straightforward.

On April 9, 1999, the Debtors filed a voluntary petition under Chapter 13 of the Bankruptcy Code. Their principal residence is located in Barrington, Rhode Island. The property has a fair market value of $118,000.00 and is encumbered by two mortgages. The first mortgage in favor of Chase Manhattan Mortgage Corporation has an approximate balance due of $119,000.00. The holder of the second mortgage, appellant Domestic Bank, is owed approximately $23,800.00.

The Debtors' Chapter 13 plan provides that: "[p]ursuant to 11 USC 1322(b)(2) and Section 506, the debtors hereby intend to strip off the entire second mortgage held by The Bank securing the property located at 7 Hancock Road, Barrington, Rhode Island and treat said claim as totally unsecured. The entire balance of said second mortgage shall be treated as an unsecured claim pursuant to 11 U.S.C. § 506 and the lien securing said portion of the indebtedness shall be void." The Bank filed a timely objection to the confirmation of the Debtors' plan, arguing that § 1322(b)(2) precludes the voiding of its lien. It was undisputed that a § 506(a) valuation would prove the second mortgage lien to be wholly unsecured.

Consistent with its previous ruling in *In re Woodhouse*, 172 B.R. 1 (Bankr.D.R.I. 1994), the bankruptcy court overruled the Bank's objection and confirmed the Chapter 13 plan. In so doing, the bankruptcy court voided the Bank's lien. The Bank's appeal followed. The Debtors and the Bank are not alone in their arguments to this panel. BankBoston and the National Association of Consumer Bankruptcy Attorneys (the "NACBA") have each filed briefs in amicus curiae. They have adopted their expected posts. BankBoston finds merit in the arguments of the Bank. The NACBA supports the views of the Debtors.

## II. JURISDICTION AND STANDARD OF REVIEW

 We have jurisdiction over this appeal pursuant to 28 U.S.C. § 158. As the

---

1. The term "strip off" is colloquially used when, there being no collateral value for a mortgage, the entire lien is proposed to be avoided. The term "strip down" is used when, there being insufficient collateral value for a mortgage, the lien is proposed to be reduced to the value of the collateral. *Lam v. Investors Thrift (In re Lam)*, 211 B.R. 36, 37 n. 2 (9th Cir. BAP 1997), *appeal dismissed*, 192 F.3d 1309 (9th Cir.1999); *In re Woodhouse*, 172 B.R. 1, 1 n. 1 (Bankr.D.R.I.1994). Neither term is found in the Bankruptcy Code.

facts are not in dispute, we review the bankruptcy court's conclusions of law de novo. *GMAC Mortgage Corp. v. Marenaro (In re Marenaro)*, 217 B.R. 358, 359 (1st Cir. BAP 1998) (citing to *Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.)*, 984 F.2d 1305, 1311 (1st Cir.1993)).

## III. *DISCUSSION*

■ The issue before us arises from the interaction of two provisions of the Bankruptcy Code, §§ 506(a)[2] and 1322(b)(2).[3] The effect of § 506(a) is that "a claim that is 'secured' under commercial law [may or may not be] a 'secured claim' in the context of the Bankruptcy Code." *Johnson v. Asset Management Group, LLC*, 226 B.R. 364, 366 (D.Md.1998). Rather, pursuant to § 506(a), a claim is deemed secured only to the extent of the value of the creditor's interest in the debtor's interest in the subject collateral. Ac-

2. 11 U.S.C. § 506(a) provides:

An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

3. 11 U.S.C. § 1322(b)(2) provides:

(b) Subject to subsections (a) and (c) of this section, the plan may—
. . .
(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims[.]

cordingly, an allowed secured claim cannot exceed the value of the collateral.

Section 1322(b)(2) permits Chapter 13 plans to modify the rights of secured claim holders. That power contains an important exception. Chapter 13 debtors may not modify "a claim secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2). But § 103(a) extends the provisions of Chapter 5 of the Bankruptcy Code to Chapter 13 cases. Therefore, what is the effect, if any, of § 506(a) on § 1322(b)(2)? Said otherwise, does the § 1322(b)(2) exception refer to the security interest as viewed under nonbankruptcy commercial law or to the allowed secured claim determined after application of § 506(a)?

■ In 1993, the Supreme Court first examined the interplay between §§ 506(a) and 1322(b)(2) in *Nobelman v. American Savings Bank*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).[4] The limited

4. The Supreme Court has also examined the strip down issue in the context of Chapter 7. *See Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). In *Dewsnup*, the Court held that a Chapter 7 debtor can not strip down an undersecured mortgage under § 506(a) and void the undersecured portion of the mortgage holder's lien by employing § 506(d). Relying on the Bankruptcy Act principle that real property liens pass through bankruptcy unaffected, and finding no congressional intention to vary from that rule when enacting the Bankruptcy Code, the Court concluded that Chapter 7 debtors can not use § 506(d) to void liens unless the claim is both disallowed and undersecured. *Id.* at 417, 112 S.Ct. 773.

*Dewsnup's* holding has little applicability here as § 1322(b)(2) provides the necessary evidence of congressional intention (to permit modifications) in Chapter 13 cases, which the Supreme Court found missing in Chapter 7. Although the pertinence of *Dewsnup* to wholly unsecured liens in Chapter 7 cases is not today before us, we note that it is also a subject of growing debate. *Compare Farha v. First Am. Title Ins. (In re Farha)*, 246 B.R. 547 (Bankr.E.D.Mich.2000); *Warthen v. Smith (In re Smith)*, 247 B.R. 191 (W.D.Va.2000); *Zempel v. Household Fin. Corp. v. PNC Bank (In re Zempel)*, 244 B.R. 625 (Bankr.W.D.Ky.1999); *Yi v. Citibank (Md.), N.A. (In re Yi)*, 219 B.R.

issue before the Court in *Nobelman* was whether a Chapter 13 debtor could bifurcate an undersecured residential mortgage claim into its secured and unsecured components pursuant to § 506(a), leaving only the secured portion protected by the § 1322(b)(2) antimodification clause.

The facts in *Nobelman* involved a residence valued at $23,500.00 and a first mortgage claim for $71,335.00. The debtors proposed in their Chapter 13 plan to bifurcate the mortgagee's claim under § 506(a) into a secured claim of $23,500.00 and an unsecured claim of $47,835.00. They offered to pay the secured portion in full, but to pay nothing on the unsecured portion. The debtors argued that § 1322(b)(2) should be construed to apply the restrictive clause "other than a claim secured only by a security interest in ... the debtor's principal residence" only to the allowed secured claim, after application of § 506(a), rather than to the entire lien claim.

The *Nobelman* Court rejected this argument. The Court adopted what was then the minority view that § 1322(b)(2) should be construed to prohibit a Chapter 13 debtor from stripping down an undersecured claim secured only by the debtor's principal residence.[5] The Supreme Court held that the creditor's rights, enforceable under state law and "bargained for by the mortgagor and the mortgagee," were those which Congress chose to protect in § 1322(b)(2). *Id.* at 329–330, 113 S.Ct. 2106 (citing to *Dewsnup v. Timm*, 502 U.S. 410, 417, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992)).

*Nobelman* did not end the controversial relationship between § 506(a) and § 1322(b)(2). Does *Nobelman* preclude a Chapter 13 debtor from stripping off a mortgage on a principal residence where there is no collateral value whatsoever for that mortgage? That question has again led to a split in the bankruptcy and district courts.[6] At this time, they appear almost

394 (E.D.Va.1998); *Howard v. National Westminister Bank, U.S.A. (In re Howard)*, 184 B.R. 644 (Bankr.E.D.N.Y.1995), *with In re Fitzmaurice*, 248 B.R. 356 (Bankr.W.D.Mo.2000); *Cunningham v. Homecomings Fin. Network (In re Cunningham)*, 246 B.R. 241 (Bankr. D.Md.2000); *Cater v. American Gen. Fin. (In re Cater)*, 240 B.R. 420 (M.D.Ala.1999); *In re Virello*, 236 B.R. 199 (Bankr.D.S.C.1999); *Swiatek v. Pagliaro (In re Swiatek)*, 231 B.R. 26 (Bankr.D.Del.1999); *Laskin v. First Nat'l Bank of Keystone (In re Laskin)*, 222 B.R. 872 (9th Cir. BAP 1998); *Crossroads of Hillsville v. Payne*, 179 B.R. 486 (W.D.Va.1995); *In re Mershman*, 158 B.R. 698 (Bankr.N.D.Ohio 1993).

**5.** Prior to *Nobelman*, there had been a division among the Circuits. A strong majority of courts, including the United States Courts of Appeals for the Second, Third, Ninth, and Tenth Circuits, construed § 1322(b)(2) to permit a Chapter 13 debtor to strip down an undersecured claim on his or her principal residence. *See, e.g., Bellamy v. Federal Home Loan Mortgage Corp. (In re Bellamy)*, 962 F.2d 176 (2nd Cir.1992); *Eastland Mortgage Co. v. Hart (In re Hart)*, 923 F.2d 1410 (10th Cir. 1991); *Wilson v. Commonwealth Mortgage Corp.*, 895 F.2d 123 (3rd Cir.1990); *Hougland v. Lomas & Nettleton Co. (In re Hougland)*, 886 F.2d 1182 (9th Cir.1989). Many bankruptcy and district courts in other circuits,

including in the First Circuit, followed that majority. *See, e.g., Richards v. Citicorp Mortgage, Inc. (In re Richards)*, 151 B.R. 8 (Bankr. D.Mass.1993); *In re Cardinale*, 142 B.R. 42 (Bankr.D.R.I.1992); *In re Torres Lopez*, 138 B.R. 348 (D.P.R.1992); *Loader v. Charlton Credit Union (In re Loader)*, 128 B.R. 13 (Bankr.D.Mass.1991); *In re Diquinzio*, 110 B.R. 628 (Bankr.D.R.I.1990).

The minority view, which the Supreme Court adopted in *Nobelman*, was embraced only by the Fifth Circuit. *See Nobleman v. American Sav. Bank (In re Nobleman)*, 968 F.2d 483 (5th Cir.1992), *aff'd*, 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993).

**6.** Leading bankruptcy treatises also take opposing views. *Compare* 8 LAWRENCE P. KING, COLLIER ON BANKRUPTCY, ¶ 1322.06[1][a][i] at 1322–21 (15th ed. rev.1998) (arguing that the *Nobelman* opinion suggests that if a lien is completely unsecured, there would be a different result) *with* 1 KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY § 4.46 at 4–56 (2nd ed.1994) (explaining that the implication of the analysis in *Nobelman* is that a completely unsecured claim holder with a lien on real property that is the debtor's principal residence would be protected from modification by § 1322(b)(2) even though such unsecured lienholder does not have an allowable secured claim under § 506(a)).

evenly divided, *McCarron v. FirstPlus Fin. (In re McCarron),* 242 B.R. 479, 482 (Bankr.W.D.Mo.2000), with a slight majority willing to distinguish *Nobelman* and hold that the antimodification clause in § 1322(b)(2) does not apply to mortgagees with totally unsecured claims.[7]

The majority decisions[8] note that the *Nobelman* Court first looked to § 506(a) to determine whether any part of the creditor's claim was secured. They remind us that the Supreme Court rejected the creditor's argument that § 506(a) was irrelevant, and that the Court took special note of the fact that the creditor was "*still* the 'holder' of a 'secured claim,' *because* [debtors'] home retain[ed] $ 23,500 of value as collateral." *Nobelman,* 508 U.S. at 329, 113 S.Ct. 2106 (emphasis supplied). Therefore, the majority draws a distinction—believed drawn by *Nobelman* itself—between mortgages which are undersecured and those wholly unsecured. They maintain that the former were intended to be protected by the antimodifi-

cation provisions of § 1322(b)(2), while the latter were not. *See, e.g., Western Interstate Bancorp v. Edwards (In re Edwards),* 245 B.R. 917, 921 (Bankr.S.D.Ga. 2000) (wholly unsecured liens do not qualify for § 1322(b)(2) protection from modification); *In re McCarron,* 242 B.R. at 483 (a second mortgagee's claim that is completely unsecured does not come within the "other than" provision of § 1322(b)(2) that was at issue in *Nobelman* ); *Lam v. Investors Thrift (In re Lam ),* 211 B.R. 36, 41 (9th Cir. BAP 1997), *appeal dismissed,* 192 F.3d 1309 (9th Cir.1999) ("The *Nobelman* decision holding that section 1322(b)(2) bars a chapter 13 plan from modifying the rights of holders of claims, secured only by the debtor's principal residence, does not apply to holders of totally unsecured claims."); *Scheuer v. Marine Midland Bank (In re Scheuer),* 213 B.R. 415, 418 (Bankr.N.D.N.Y.1997) (a creditor's claim that is secured only by the debtor's principal residence is not entitled to the protection of § 1322(b)(2) if the claim is determined to be totally unse-

**7.** The issue before us has not been directly addressed in any published opinion of the United States Court of Appeals for the First Circuit. Like in many other circuits, there is a split of opinion among our bankruptcy courts. As noted above, Chief Judge Votolato of the United States Bankruptcy Court for the District of Rhode Island has ruled that wholly unsecured mortgages are not entitled to the § 1322(b)(2) protection. *In re Woodhouse,* 172 B.R. at 3. The United States Bankruptcy Court for the District of New Hampshire has ruled otherwise. *Fraize v. Beneficial Mortgage Corp. of N.H. (In re Fraize),* 208 B.R. 311, 313 (Bankr.D.N.H.1997).

**8.** *See, e.g., Bartee v. Tara Colony Homeowners Ass'n (In re Bartee),* 212 F.3d 277 (5th Cir. 2000); *McDonald v. Master Fin., Inc. (In re McDonald),* 205 F.3d 606 (3rd Cir.2000); *Western Interstate Bancorp v. Edwards (In re Edwards),* 245 B.R. 917 (Bankr.S.D.Ga.2000); *In re Baez,* 244 B.R. 480 (S.D.Fla.2000); *In re McCarron,* 242 B.R. 479 (Bankr.W.D.Mo. 2000); *Johnson v. Asset Management Group, LLC,* 226 B.R. 364 (D.Md.1998); *In re Phillips,* 224 B.R. 871 (Bankr.W.D.Mich.1998); *In re Cerminaro,* 220 B.R. 518 (Bankr. N.D.N.Y.1998); *Smith v. First Citizens Bank (In re Smith),* 215 B.R. 716 (Bankr.W.D.Tenn. 1998); *In re Cervelli,* 213 B.R. 900 (Bankr. D.N.J.1997); *In re Lam,* 211 B.R. 36 (9th Cir.

BAP 1997); *In re Bivvins,* 216 B.R. 622 (Bankr.E.D.Tenn.1997); *Scheuer v. Marine Midland Bank (In re Scheuer),* 213 B.R. 415 (Bankr.N.D.N.Y.1997); *In re Geyer,* 203 B.R. 726 (Bankr.S.D.Cal.1996); *In re Sanders,* 202 B.R. 986 (Bankr.D.Neb.1996); *In re Libby,* 200 B.R. 562 (Bankr.D.N.J.1996); *Vaillancourt v. Marlow (In re Vaillancourt),* 197 B.R. 464 (Bankr.M.D.Pa.1996); *Associates Fin. Servs. Corp. v. Purdue (In re Purdue),* 187 B.R. 188 (S.D.Ohio 1995); *Wright v. Commercial Credit Corp.,* 178 B.R. 703 (E.D.Va.1995), *appeal dismissed,* 77 F.3d 472, 1996 WL 63023 (4th Cir.1996); *Norwest Fin. Georgia, Inc. v. Thomas (In re Thomas),* 177 B.R. 750 (Bankr. S.D.Ga.1995); *In re Lee,* 177 B.R. 715 (Bankr. N.D.Ala.1995); *Castellanos v. PNC Bank, Nat'l Ass'n (In re Castellanos),* 178 B.R. 393 (Bankr.M.D.Pa.1994); *Sette v. Bello (In re Sette),* 164 B.R. 453 (Bankr.E.D.N.Y.1994); *In re Mitchell,* 177 B.R. 900 (Bankr.E.D.Mo. 1994); *In re Woodhouse,* 172 B.R. 1 (Bankr. D.R.I.1994); *In re Lee,* 161 B.R. 271 (Bankr. W.D.Okla.1993); *In re Hornes,* 160 B.R. 709 (Bankr.D.Conn.1993); *In re Williams,* 161 B.R. 27 (Bankr.E.D.Ky.1993); *In re Kidd,* 161 B.R. 769 (Bankr.E.D.N.C.1993); *In re Plouffe,* 157 B.R. 198 (Bankr.D.Conn.1993); *In re Moncrief,* 163 B.R. 492 (Bankr.E.D.Ky.1993).

cured); *In re Geyer,* 203 B.R. 726, 729 (Bankr.S.D.Cal.1996) (where the creditor's interest in property is zero, its claim is completely unsecured under § 506(a) and is not entitled to the protection of § 1322(b)(2)); *In re Lee,* 161 B.R. 271, 273 (Bankr.W.D.Okla.1993) (Chapter 13 debtors are not prohibited by § 1322(b)(2) from modifying the rights of a second mortgagee's claim that is wholly unsecured); *In re Hornes,* 160 B.R. 709, 714 (Bankr.D.Conn.1993) (even though the creditor's claim is literally within the language of the "other than" clause, § 1322(b)(2) does not protect its rights if it holds only a totally unsecured claim in the code sense).

But many courts hold that the antimodification clause in § 1322(b)(2) governs even if the mortgagee's claim is wholly unsecured.[9] By and large, these courts believe focusing on the value of the collateral underlying the mortgage is just the analysis which the Supreme Court rejected in *Nobelman.* They remind us that the Court relied instead on an examination of the state law "rights" of the lender, and ruled that those rights could not be modified regardless of the status of the underlying collateral. Many of these courts also argue that it is unreasonable to place too much emphasis on valuations. They find it irrational and unfair that the outcomes of cases would turn on appraisers' estimates of property values. They note that "if the property is valued at one penny greater than the claim of the senior mortgagee, the junior mortgagee's claim would receive full protection. However, if the property is valued at one penny less than the claim of the senior mortgagee, the junior mortgagee would be left completely unprotected." *In re Perry,* 235 B.R. 603, 607 (S.D.Tex. 1999); *American Gen. Fin., Inc. v. Dickerson,* 229 B.R. 539, 542–43 (M.D.Ga.1999); *Fraize v. Beneficial Mortgage Corp. of N.H. (In re Fraize),* 208 B.R. 311, 313 (Bankr.D.N.H.1997).

Of the Circuits, only the Third and Fifth have addressed the issue. *See In re McDonald,* 205 F.3d 606 (3rd Cir.2000); *Bartee v. Tara Colony Homeowners Ass'n (In re Bartee),* 212 F.3d 277 (5th Cir.2000). Both circuits have adopted the view that the holder of a wholly unsecured mortgage on a debtor's principal residence is not entitled to the protection of § 1322(b)(2). *Id.* The Ninth Circuit Bankruptcy Appellate Panel has come to the same conclusion. *In re Lam,* 211 B.R. 36 (9th Cir. BAP 1997).

▪ Relying on the plain language of the statute, the Third and Fifth Circuits have rejected the reasoning that §§ 506(a) and 1322(b)(2) are in conflict. *In re McDonald,* 205 F.3d at 611–612; *In re Bartee,* 212 F.3d at 289–291. We agree. As have both circuits, we find that the two sections can and must be read in harmony. The *Nobelman* court did not abandon § 506(a). Rather, the Supreme Court assigned to § 506(a) an important role in determining whether a junior mortgagee holds an "allowed secured claim" in any

9. *See, e.g., In re Lane,* 248 B.R. 534 (Bankr. E.D.Tenn.2000); *In re Enriquez,* 244 B.R. 156 (Bankr.S.D.Cal.2000); *In re Abruzzo,* 245 B.R. 201 (Bankr.E.D.Pa.1999); *Ortiz v. Household Fin. Corp. (In re Ortiz),* 241 B.R. 460 (Bankr.E.D.Cal.1999); *In re Perkins,* 237 B.R. 658 (Bankr.S.D.Ohio 1999); *Boehmer v. ESSEX (In re Boehmer),* 240 B.R. 837 (Bankr. E.D.Pa.1999); *In re Perry,* 235 B.R. 603 (S.D.Tex.1999); *Cupp v. Associates Consumer Discount Co. (In re Cupp),* 229 B.R. 662 (Bankr.E.D.Pa.1999); *American Gen. Fin., Inc. v. Dickerson,* 229 B.R. 539 (M.D.Ga. 1999); *In re Diggs,* 228 B.R. 611 (Bankr. W.D.La.1999); *Tanner v. Firstplus Fin., Inc.*

*(In re Tanner),* 223 B.R. 379 (Bankr.M.D.Fla. 1998); *Lewandowski v. U.S. Department of Housing and Urban Development (In re Lewandowski),* 219 B.R. 99 (Bankr.W.D.Pa.1998); *In re Shandrew,* 210 B.R. 829 (Bankr.E.D.Cal. 1997); *In re Bauler,* 215 B.R. 628 (Bankr. D.N.M.1997); *Fraize v. Beneficial Mortgage Corp. of N.H. (In re Fraize),* 208 B.R. 311, (Bankr.D.N.H.1997); *Barnes v. American Gen. Fin. (In re Barnes),* 207 B.R. 588 (Bankr. N.D.Ill.1997); *In re Robinson,* 231 B.R. 30 (Bankr.D.N.J.1997); *In re Jones,* 201 B.R. 371 (Bankr.D.N.J.1996); *In re Barnes,* 199 B.R. 256 (Bankr.W.D.N.Y.1996); *In re Neverla,* 194 B.R. 547 (Bankr.W.D.N.Y.1996).

amount. In *Nobelman*, the Supreme Court noted:

> [Debtors] were correct in looking to § 506(a) for a judicial valuation of the collateral to determine the status of the [mortgagee's] secured claim. It was permissible for [debtors] to seek a valuation in proposing their Chapter 13 plan, since § 506(a) states that '[s]uch value shall be determined ... in conjunction with any hearing ... on a plan affecting such creditor's interest.' But even if we accept [debtors'] valuation, the bank is *still* the 'holder' of a 'secured claim,' *because* [debtors'] home retains $23,500 of value as collateral.

508 U.S. at 328–29, 113 S.Ct. 2106 (emphasis supplied). While § 1322(b)(2) provides antimodification protection to holders of secured claims, § 506(a) tells us what a secured claim is (and is not). Therefore, we cannot accept the minority position that a secured claim should be defined as any claim for which a lien exists, regardless of the lack of any value underlying that lien. *Wright v. Commercial Credit Corp.*, 178 B.R. 703, 707 (E.D.Va.1995), *appeal dismissed*, 77 F.3d 472, 1996 WL 63023 (4th Cir.1996). That approach would completely disregard the effect of both §§ 103(a) and 506(a). And that was most certainly not the approach adopted in *Nobelman*. Instead, a claim protected from modification under § 1322(b)(2) must be at least partially secured, as determined by § 506(a). *See Wright*, 178 B.R. at 707 (where there is no value underlying the claim, there is only an unsecured claim despite the existence of a document to the contrary); *In re Hornes*, 160 B.R. at 715 ("The code does not generally classify creditors based on the existence of a piece of paper purporting to give a creditor rights in specified collateral, but rather on whether a creditor actually holds a claim supported by valuable estate property."); *In re Plouffe*, 157 B.R. 198, 200 (Bankr. D.Conn.1993) ("There is neither a logical nor rational basis for a creditor holding a completely unsecured claim to be protected from claim modification in a bankruptcy

case simply because the creditor had obtained a lien on the homestead prepetition.").

Those decisions which interpret *Nobelman* to preclude the voiding of all junior mortgage liens on a debtor's principal residence are not unreasonable in their focus on *Nobelman's* "rights" discussion. But they fail to appreciate the *Nobelman* Court's conclusion that those "rights" flowed first from a lien which had *some* collateral value. Furthermore, it is not quite correct to say that the only consequence of reading § 1322(b)(2) to preclude the modification of liens without collateral value is the preservation of lienholder rights enjoyed outside of bankruptcy. The mortgagee's rights in *Nobelman* included "the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure." *Nobelman*, 508 U.S. at 329, 113 S.Ct. 2106. Yet when a junior mortgagee's lien is completely unsecured, these purported rights have little legal or practical effect. *In re Lam*, 211 B.R. at 40. As the *Lam* court dryly noted, "[n]othing secures the 'right' of the lienholder to continue to receive monthly installment payments, to retain the lien until the debt is paid off, or the right to accelerate the loan upon default, if there is no security available to the lienholder to foreclose on in the event the debtor fails to fulfill the contract payment obligations." *Id.* And similarly blunt, Chief Judge Votolato described these purported rights of wholly unsecured lien creditors in *In re Woodhouse*, 172 B.R. at 2, as "illusory, hyper-technical, and possibly relevant only in law review articles."

Outside of bankruptcy, a lien with no collateral value cannot deliver any funds to

the lienholder upon foreclosure. Such a lien should not deliver better rights in the bankruptcy court. *See In re McCarron,* 242 B.R. at 484; *In re Johnson,* 226 B.R. at 369. But if § 1322(b)(2) is read to preclude the stripping off of such liens, the Chapter 13 debtor with property encumbered by a wholly unsecured lien is compelled to pay the underlying claim in full in order to comply with the mandate of § 1325(a)(5).[10] Inasmuch as that claim has no collateral value to assure payment in a nonbankruptcy context, it is hard to square its payment in full while other unsecured claims receive much smaller dividends, if any; and even harder when one considers the Code's mandate that the Chapter 13 plan effect no unfair discrimination against any class of unsecured creditors. 11 U.S.C. § 1322(b)(1).

Other "rights" of wholly unsecured liens are similarly vacuous. True, a junior mortgagee has the right to advance funds to a senior lienholder to preserve the junior mortgagee's position, and also the right to enjoy the benefit of any increase in the value of the property. *See In re Enriquez,* 244 B.R. 156, 161 (Bankr.S.D.Cal.2000); *In re Diggs,* 228 B.R. 611, 614 (Bankr. W.D.La.1999); *Barnes v. American Gen. Fin. (In re Barnes),* 207 B.R. 588, 594 (Bankr.N.D.Ill.1997); *Dewsnup,* 502 U.S. at 417, 112 S.Ct. 773. But the right to advance funds to protect collateral has little practical allure for the holder of a completely unsecured lien. *In re Lam,* 211 B.R. at 40. Further, if the possibility of property appreciation were to preclude lien avoidance, no final determination could ever be made in a bankruptcy case. *Cf. Snyder v. Rockland Trust Co. (In re Snyder),* 249 B.R. 40 (1st Cir. BAP 2000) (for

the purpose of determining exemptions, valuations should be fixed and not be made subject to later determinations). "[T]here is always some theoretical potential for the value of the collateral to increase." *Yi v. Citibank (Md.), N.A. (In re Yi),* 219 B.R. 394, 398 (E.D.Va.1998).

Three other arguments made by the appellant and/or courts espousing the minority view merit our consideration. First, some express concern that the power of a court to void a wholly unsecured lien will lead to decisions made on the basis on what might very well be a swing of $1.00 in value. With the collateral worth $1.00 to the junior mortgagee, *Nobelman* teaches that the lien may not be avoided. With the collateral worth $1.00 less, the junior lien would be voided in full. That distinction, they say, would be unfair; and judges, they feel, do not have a level of valuation expertise that would justify distinctions that finely made. In answer, we respond that bankruptcy judges make distinctions of similar import in a variety of other contexts. As the *McDonald* court aptly noted:

> Bright-line rules that use a seemingly arbitrary cut-off point are common in the law. A day beyond the statute of limitations and the plaintiff must lose, even if the claim was otherwise unquestionably a winning one. If the evidence is just over a preponderance, the plaintiff wins full damages; just under, the plaintiff gets nothing. In bankruptcy law a Chapter 7 trustee cannot contest the validity of a debtor's claimed exemption when the 30–day period for objecting has expired and the trustee failed to obtain an extension; and this is true

**10.** 11 U.S.C. § 1325(a)(5) provides:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

. . .

(5) with respect to each allowed secured claim provided for by the plan—
(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or
(C) the debtor surrenders the property securing such claim to such holder[.]

even if the debtor has no colorable basis for claiming the exemption..... What these examples show is that line drawing is often required in the law and, at the boundary, the appearance of unfairness is unavoidable. Simply pointing out that some arbitrariness occurs is not a compelling objection.

205 F.3d at 613 (citation omitted). Line drawing and cut-off points are often required in the law even if they appear to be unfair. *In re Lam*, 211 B.R. at 41; *In re Bivvins*, 216 B.R. 622, 625 (Bankr. E.D.Tenn.1997) (citing to Bankruptcy Code §§ 109(e), 507(a)(3)-(6), 522(d), 523(a)(2)(C), and 547(c)(8)). *See also In re Johnson*, 226 B.R. at 369 ("The fact that courts may be concerned with drawing sharp lines with harsh effects does not excuse the need for doing so."). We also respond by acknowledging the irony that judges, few of whom would qualify as expert witnesses in any trial of asset valuation, regularly determine the worth of assets, sometimes forced to choose between the conflicting reports of undisputed experts. But leaving such resolutions in the hands of lay fact-finders is consistent with both the common law and sound public policy. Safeguarding ultimate questions of fact for the lay fact-finder is not a weakness of the law, but one of its greatest strengths.

Second, some express concern that the avoidance of junior unsecured mortgages could result in pre-bankruptcy planning abuse. They worry that debtors, in anticipation of filing a Chapter 13 case, could eliminate the collateral of a junior mortgagee by synchronizing the date of bankruptcy filing with defaults on debt to a senior mortgagee. *See In re Neverla*, 194 B.R. 547, 551–52 (Bankr.W.D.N.Y.1996); *Norwest Fin. Georgia, Inc. v. Thomas (In re Thomas)*, 177 B.R. 750, 753 (Bankr. S.D.Ga.1995). That concern is not materi-al to the case before us. We have no evidence that the Manns stopped making payments on their first mortgage in order to deplete collateral value for the second. In fact, it would seem to us to be the rare instance in which the numbers would be so aligned as to afford the opportunity for such a strategy. Further, it is not logical to bar the legitimate use of a remedy by many honest debtors simply because some scoundrel may abuse it. Rather, it is the obligation of courts to distinguish between the two. *Cf. Keach v. Boyajian (In re Keach)*, 243 B.R. 851, 868 (1st Cir. BAP 2000) (the meaning of the term good faith for the purpose of § 1325(a)(3)[11] is "simple honesty of purpose").

■ Third, many courts cite a well-founded concern that proper interpretation of § 1322(b)(2) remain congruent with legislative history reflecting Congress' "favorable treatment of residential mortgagees [in order] to encourage the flow of capital into the home lending market." *Nobelman*, 508 U.S. at 332, 113 S.Ct. 2106 (concurrence by Justice Stevens). "The plain meaning of legislation should be conclusive, [but not] in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)(quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)). Here, the plain interaction of § 1322(b)(2) and § 506(a), permitting the voiding of wholly unsecured mortgages on principal residences, does not conflict with the result intended by Congress. As noted by the Third Circuit Court of Appeals in *McDonald*, 205 F.3d at 613, "[b]ecause second mortgages are rarely used to purchase a home, making wholly unsecured second mortgages subject to the antimodification

---

**11.** 11 U.S.C. § 1325(a)(3) provides:
 (a) Except as provided in subsection(b), the court shall confirm a plan if—
 . . .

 (3) the plan has been proposed in good faith and not by any means forbidden by law[.]

840

clause would have at best a minimal impact in encouraging [or discouraging] home building and buying." *See also In re Baez*, 244 B.R. 480, 484 (S.D.Fla.2000); *In re Lam*, 211 B.R. at 41; *In re Plouffe*, 157 B.R. at 200. On the contrary, failing to differentiate between true mortgage lending and the practice (seen by many as predatory) of obtaining mortgages on already oversecured property in support of the collection of otherwise unsecured dischargeable debt would do far more damage to the goals of Congress in enacting the antimodification provision of § 1322(b)(2). *See In re Bartee*, 212 F.3d at 292–295 (excellent treatment of the legislative history and policy considerations).

## IV. CONCLUSION

We agree with the Third and Fifth Circuit Courts of Appeals, the Ninth Circuit Bankruptcy Appellate Panel, and the several bankruptcy and districts courts making up the majority view. Pursuant to § 506(a) and § 1322(b)(2), and notwithstanding the antimodification provision in the latter, Chapter 13 plans may void residential real property liens that are wholly unsecured. We believe that a literal reading of § 1322(b)(2) and § 506(a) mandates this result and that our view is congruent with the *Nobelman* decision which relegated the role of the antimodification provision of § 1322(b)(2) to claims first made subject to § 506(a) treatment. We decline to read *Nobelman* as mandating better rights for unsecured creditors holding a document purporting to be a residential real property mortgage than for unsecured creditors without. We find unwarranted the argument that the burden of asset appraisal or the risk of bankruptcy abuse are beyond a court's ability to carry out its responsibilities. Neither concern justifies elevating one group of unsecured creditors over another or denying to debtors a remedy intended by Congress for Chapter 13 debtors. And we find without foundation the contention that Congress intended to provide to second mortgagees holding

wholly unsecured liensparties at the very most peripheral and occasional to the process of home building or buying with rights similar to those of first mortgagees.

Any interpretation of the Bankruptcy Code which relies on a suspension of reality deserves to be subjected to a significant level of skepticism. Here, the bankruptcy judge was unable to find any collateral value for the Bank's mortgage lien. Accordingly, he ruled that the Bank enjoyed only the rights of a holder of an unsecured claim. Our reading of the Bankruptcy Code supports the bankruptcy judge's ruling. And we do not believe that Congress intended otherwise.

The bankruptcy court's order confirming the Debtors' Chapter 13 plan is AFFIRMED.